## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| Julian Hurt and Mary Wilson, on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | Civil Action No. 1:19-cv-1040 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Citizens Equity First Credit Union, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Julian Hurt and Mary Wilson, by counsel, and for their Class Action Complaint against the Defendant, allege as follows:

### NATURE OF THE ACTION

1.      Plaintiffs bring this action on behalf of themselves and classes of all similarly situated consumers against Citizens Equity First Credit Union ("CEFCU" or the "Credit Union"), arising from its routine practice of a) assessing Overdraft Fees on transactions that did not actually overdraw a checking account; and b) assessing more than one insufficient funds fee ("NSF Fee") on the same item.

2.      CEFCU misleadingly and deceptively misrepresents its fee practices, including in its own account contracts. CEFCU also omits material facts pertaining to each of the above practices, including in its account contracts.

3.      This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief.

4.      As described herein, Defendant's practices violate Illinois common and statutory law, as well as the Defendant's own form contracts.

5.      Defendant's improper scheme to extract funds from accountholders already struggling to make ends meet has victimized Plaintiffs and thousands of others.  Unless enjoined, Defendant will continue to engage in these schemes and cause substantial injury to its checking account holders.

## JURISDICTION

6.      This Court has original jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of each of the putative Classes exceeds $5 million, exclusive of interest and costs, because Plaintiffs bring this action on behalf of proposed classes that are each comprised of over one hundred members, and because at least one of the members of each of the proposed Classes is a citizen of a different state than Defendant.

7.      Venue is appropriate under 28 U.S.C. § 1391(b) because Defendant resides in this District and is the only Defendant in this action.

## PARTIES

8.      Plaintiff Julian Hurt ("Plaintiff Hurt") is a citizen of Illinois. Plaintiff Hurt has a personal checking account with CEFCU, which is governed by a Deposit Agreement.

9.      Plaintiff Mary Wilson ("Plaintiff Wilson") is a citizen of Illinois. Plaintiff Wilson has a personal checking account with CEFCU, which is governed by a Deposit Agreement.

10.     Defendant CEFCU is one of the largest credit unions in Illinois. It has $6 billion in assets and maintains its headquarters in Peoria, Illinois.

## BACKGROUND FACTS

### I. CEFCU CHARGES OVERDRAFT FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

#### A. Overview of Claim

11.     Plaintiff Hurt brings this cause of action challenging CEFCU's practice of charging Overdraft Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

12.     Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, CEFCU immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. Therefore, customers' accounts will always have sufficient available funds available to cover these transactions because CEFCU has already sequestered these funds for payment.

13.     However, CEFCU still assesses crippling $30 Overdraft Fees on many of these transactions, and mispresents its practices in its account documents.

14.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, CEFCU later assesses Overdraft Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN transactions.

15.     CEFCU maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, CEFCU sequesters the funds needed to pay the transaction,

subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

16.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 2009).

17.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur Overdraft Fees due to the unavailability of the funds sequestered for those debit card transactions.

18.     Still, despite keeping those held funds off-limits for other transactions, CEFCU improperly charges Overdraft Fees on those APPSN Transactions, although the APPSN transactions *always* have sufficient available funds to be covered.

19.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a

4

customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

20.    There is no justification for these practices, other than to maximize CEFCU's Overdraft Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But CEFCU is free to protect its interests and either reject those intervening transactions or charge Overdraft Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But CEFCU was not content with these millions in Overdraft Fees. Instead, it sought millions *more* in Overdraft Fees on these APPSN Transactions.

21.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in CEFCU's adhesion contracts—contracts which fundamentally misconstrue and mislead consumers about the true nature of CEFCU's processes and practices. These practices also exploit contractual discretion to gouge consumers.

22.     In plain, clear, and simple language, the checking account contract documents covering Overdraft Fees promise that CEFCU will only charge Overdraft Fees on transactions that have insufficient funds to cover that transaction.

23.     In short, CEFCU is not authorized by contract to charge Overdraft Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B. Mechanics of a Debit Card Transaction**

24.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from CEFCU. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to CEFCU, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

25.     At this step, if the transaction is approved, CEFCU immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

26.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds

> in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 2009).

27.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

28.    There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

**C. CEFCU's Account Contract**

29.    Plaintiff Hurt has a CEFCU checking account, which is governed by CEFCU's standardized Deposit Account Agreement (the "Deposit Agreement"). A true and accurate copy of the Deposit Agreement is attached as Exhibit A.

30.    The Deposit Agreement and relevant contract documents covering Overdraft Fees provide that CEFCU will not charge Overdraft Fees on transactions that have sufficient funds to cover them at the time they are initiated.

31.    CEFCU promises that "available" balance is the balance used to determine overdrafts; and that "available" funds are reduced for holds, including those placed immediately on debit card transactions, and those holds are "maintained" until posting:

> You can use your CEFCU Debit Card at participating merchants to pay for goods or services from available funds in your Checking account…When you use your CEFCU Debit Card [for a signature-based POS transaction]…it may take from a few hours to several days or more before the transaction is posted to your account. If you use your CEFCU Debit Card [for a signature-based POS transaction], the merchant will usually contact us and request authorization of the transaction…If we approve the authorization request, we are obligated to pay the amount requested by the merchant.  You agree that at the time the authorization request is approved by us, we may place a hold on the available balance in your account for

the total amount requested by the merchant. You agree that the hold will be maintained until the earlier of the day the transaction is posted to your account or until the third business day after the day of authorization[.]

Ex. A, Deposit Agreement § 13.g.

32.    The Deposit Agreement states that CEFCU's decision whether to "authorize and pay" a transaction is the relevant point for determining whether an Overdraft Fee applies:

. . . CEFCU, in its sole discretion, may authorize and pay ATM withdrawals and one-time debit card transactions that overdraft your Checking account[.]

*Id*.

33.    Via these provisions of the Deposit Agreement, CEFCU promises that it uses available balance—the same balance that is immediately reduced when a debit card transaction is authorized—to determine whether an overdraft occurs and a fee is assessed.

34.    For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet CEFCU assesses Overdraft Fees on them anyway.

35.    The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APPSN Transactions.

36.    In fact, CEFCU actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to "post" those same transactions. Instead, it uses a secret posting process described below.

37.    All the above representations and contractual promises are untrue. In fact, CEFCU charges Overdraft Fees even when sufficient funds exist to cover transactions that are "authorized" into a positive balance. No express language in any document states that CEFCU may impose Overdraft Fees on any APPSN Transactions.

38.     The account documents misconstrue CEFCU's true debit card processing and overdraft practices.

39.     First, and most fundamentally, CEFCU charges Overdraft Fees on debit card transactions for which there are sufficient funds available to cover the transactions.

40.     CEFCU assesses Overdraft Fees on APPSN Transactions that *do* have sufficient funds available to pay them throughout their lifecycle.

41.     CEFCU's practice of charging Overdraft Fees even when sufficient available funds exist to pay a transaction violates a contractual promise not to do so. This discrepancy between CEFCU's actual practice and the contractual promise causes consumers like Plaintiff Hurt to incur more Overdraft Fees than they should.

42.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

43.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what CEFCU does when it re-debits the account during a secret batching posting process.

44.     In reality, CEFCU's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

45.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, CEFCU cannot then charge an Overdraft Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

9

46.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, CEFCU does something new and unexpected, during the middle of its nightly batch posting process. Specifically, CEFCU releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

47.     This secret step allows CEFCU to charge Overdraft Fees on transactions that never should have been charged—transactions that were authorized into sufficient funds, and for which CEFCU specifically set aside money to pay them.

48.     This discrepancy between CEFCU's actual practices and the contract causes consumers to incur more Overdraft Fees than they should.

49.     In sum, there is a huge gap between CEFCU's practices as described in the account documents and CEFCU's practices in reality.

**D.  CEFCU Abuses Contractual Discretion**

50.     In addition to breaching the express terms of numerous account documents, CEFCU's treatment of debit card transactions to charge Overdraft Fees exploits contractual discretion to the detriment of accountholders.

51.     The terms "to pay" and "to cover" a transaction are undefined. CEFCU uses its discretion to define these terms in a manner contrary to any reasonable, common sense understanding of the terms. In CEFCU's implied definition, a balance is insufficient to "pay" or "cover" a transaction even if CEFCU sequesters sufficient available funds for that transaction at the time it is made.

52.     Moreover, CEFCU uses its contractual discretion to cause APPSN Transactions to incur Overdraft Fees by knowingly authorizing later transactions that it allows to consume

available funds previously sequestered for APPSN Transactions, and by allowing holds to expire or be consumed before posting.

53.     CEFCU unfairly uses all of these contractual discretion points to extract Overdraft Fees on transactions that no reasonable consumer would believe could cause Overdraft Fees.

**E.   Reasonable Consumers Understand Debit Card Transactions are Debited Immediately**

54.     The assessment of Overdraft Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

55.     CEFCU was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

56.     CEFCU knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device because the money comes directly out of a checking account.

57.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card.

58.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, Consumer Action, https://www.consumer-action.org/english/articles/understanding_debit_cards (last visited May 1, 2019).

59.     That is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Cash for Smallest Purchases*, MarketWatch (Mar. 23, 2016), http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

60.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

61.     CEFCU was aware of consumers' perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

**F.  Plaintiff Hurt's Debit Card Transactions**

62.     As one example, on August 30, 2017, Plaintiff Hurt was assessed three Overdraft Fees in the amount of $30.00 each on debit card transactions that settled that day, despite the fact

that positive funds were deducted immediately, many days prior, for at least two of the transactions on which Plaintiff Hurt was assessed an Overdraft Fee.

## II.    CEFCU CHARGES TWO OR MORE NSF FEES ON THE SAME ITEM

63.    As alleged more fully herein, CEFCU's Deposit Agreement allows it to charge a single $30 NSF Fee when an item, including an electronic payment item, is returned for insufficient funds.

64.    In contrast to its Deposit Agreement, however, CEFCU regularly assesses two or more NSF Fees on the *same* item.

65.    This abusive practice is not universal in the financial services industry.  Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one NSF Fee on the same item when it is reprocessed.  Instead, Chase charges one NSF Fee even if a transaction is resubmitted for payment multiple times.

66.    CEFCU's Deposit Agreement never discloses this practice. To the contrary, the Credit Union's Deposit Agreement indicates it will only charge a single NSF Fee on an item or per transaction.

### A.  Plaintiff Wilson's Experience

67.    In support of her claims, Plaintiff Wilson offers an example of an NSF Fee that should not have been assessed against her checking account. As alleged below, CEFCU: (a) reprocessed a previously declined transaction; and (b) charged an additional fee upon reprocessing.

68.    On November 6, 2018, Plaintiff Wilson attempted an electronic payment to Geico in the amount of $46.73.

69.     CEFCU rejected payment of that transaction due to insufficient funds in Plaintiff Wilson's account and charged her a $30 NSF Fee for doing so.  Plaintiff Wilson does not dispute the initial fee, as it is allowed by CEFCU's Deposit Agreement.

70.     Unbeknownst to Plaintiff Wilson and without her request to CEFCU to retry the item, however, seven days later, on November 13, 2018, CEFCU processed the same transaction, and again CEFCU rejected the transaction due to insufficient funds and charged Plaintiff Wilson *another* $30 NSF Fee.

71.     *In sum, CEFCU charged Plaintiff Wilson $60 in fees to attempt to process a single insurance payment.*

72.     Plaintiff Wilson understood the payment to be a single transaction as is laid out in CEFCU's contract, capable at most of receiving a single NSF Fee (if CEFCU returned it) or a single Overdraft Fee (if CEFCU paid it).

**B.  The Imposition of Multiple NSF Fees on a Single Transaction Violates CEFCU's Express Promises and Representations**

73.     CEFCU's Deposit Agreement states that a singular NSF Fee can be assessed on checks, ACH debits, and electronic payments.

74.     CEFCU's Deposit Agreement states that it will charge $30 per item or transaction that is returned due to insufficient funds.

75.     According to the Deposit Agreement, at most a <u>single</u> fee will be assessed when an item is returned:

> If on any day the funds in your IMMA are not sufficient to cover checks, drafts, in-person withdrawals, ACH Debits, ATM withdrawals [etc.]…CEFCU may return any such item, and you will be charged an NSF Fee as set forth in the Fee Schedule.

76.     The same "check" or "ACH debit" on an account cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff Wilson took no action to resubmit it.

77.     There is zero indication anywhere in the Deposit Agreement that the same "check" or "ACH debit" is eligible to incur multiple NSF Fees.

78.     Even if CEFCU reprocesses an instruction for payment, it is still the same "check" or "ACH debit." The Credit Union's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

79.     The disclosures described above never discuss a circumstance where CEFCU may assess multiple NSF Fees for a single check or ACH transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

80.     In sum, CEFCU promises that one $30 NSF Fee will be assessed per ACH debit or check, and these terms must mean all iterations of the same instruction for payment.  As such, CEFCU breached the contract when it charged more than one fee per item.

81.     Reasonable consumers understand any given authorization for payment to be one, singular "check" or "ACH debit," as those terms are used in CEFCU's Deposit Agreement.

82.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which the Credit Union will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere does CEFCU disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor do CEFCU customers ever agree to such fees.

83.     Based on the language of the Deposit Agreement and CEFCU's other Deposit Agreement, customers reasonably understand that the Credit Union's reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger NSF Fees.  In other words, it is always the same item or transaction.

84.     Banks and credit unions like CEFCU that employ this abusive practice know how to plainly and clearly disclose it.  Indeed, other banks and credit unions that engage in this abusive practice disclose it expressly to their accountholders—something CEFCU never did.

85.     For example, First Citizens Bank, a major institution in the Carolinas, engages in the same abusive practice as CEFCU, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

(emphasis added).

86.     First Hawaiian Bank engages in the same abusive practices as Defendant, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

(emphasis added).

87.     Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your

Bill Payment Account. We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

88.     CEFCU provides no such disclosure, and, in so doing, deceives its accountholders.

C. **The Imposition of Multiple NSF Fees on a Single Transaction Breaches CEFCU's Duty of Good Faith and Fair Dealing**

89.     Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. In such circumstances, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that CEFCU is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, CEFCU has a duty to honor transaction requests in a way that is fair to Plaintiff Wilson and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties on the depositor. Here—in the adhesion agreements CEFCU foisted on Plaintiffs and its other customers— CEFCU has provided itself numerous discretionary powers affecting customers' credit union accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, CEFCU abuses that discretion to take money out of consumers' account without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

90.     CEFCU exercises its discretion in its own favor—and to the prejudice of Plaintiff Wilson and its other customers—when it defines "item" in a way that directly leads to more NSF Fees. Further, CEFCU abuses the power it has over customers and their credit union accounts

and acts contrary to their reasonable expectations under the Deposit Agreement. This is a breach of the Credit Union's implied covenant to engage in fair dealing and act in good faith.

91.     By exercising its discretion in its own favor—and to the prejudice of Plaintiff Wilson and other customers—by charging more than one NSF Fee on a single item, CEFCU breaches the reasonable expectation of Plaintiff Wilson and other customers and violates the implied covenant to act in good faith.

92.     It was bad faith and totally outside Plaintiff Wilson's reasonable expectations for CEFCU to use its discretion to assess two or three NSF Fees for a single attempted payment.

93.     When CEFCU charges multiple NSF Fees, the Credit Union uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations.  CEFCU uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more NSF Fees.

## CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

95.     Description of the Classes:  Plaintiffs bring this class action on behalf of themselves and four classes of persons ("the Classes") defined as follows:

> All persons who, during the applicable statute of limitations, were charged Overdraft Fees on debit card transactions that did not overdraw a CEFCU checking account at the time of authorization (the "APPSN Class").

> All persons in the State of Illinois who, during the applicable statute of limitations, were charged Overdraft Fees on debit card transactions that did not overdraw a CEFCU checking account at the time of authorization (the "Illinois APPSN Subclass").

All persons who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item on a CEFCU checking account (the "Multiple NSF Class").

All persons in the State of Illinois who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item on a CEFCU checking account (the "Illinois Multiple NSF Subclass").

96.     Excluded from the Classes are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Classes is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

97.     The time period for each of the Classes is the number of years immediately preceding February 7, 2019, the date on which the original Complaint in this action was filed as allowed by the applicable statute of limitations, going forward into the future until such time as CEFCU remedies the conduct complained of herein.

98.     <u>Numerosity</u>:  The members of the proposed Classes are so numerous that individual joinder of all members is impracticable.  The exact number and identities of the members of the proposed Classes are unknown at this time and can be ascertained only through appropriate discovery.  Plaintiffs estimate the number of members in each Class to be in the thousands.

99.     <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of law and fact common to Plaintiffs and the Classes, and those questions substantially predominate over any questions that may affect individual Class members.  Common questions of law and fact include:

        A.     Whether CEFCU charged Overdraft Fees on transactions that did not overdraw an account at the time of authorization;

19

B.      Whether CEFCU charged more than one NSF Fee on the same item;

C.      Whether CEFCU breached its own contract by charging Overdraft Fees on transactions that did not overdraw an account;

D.      Whether CEFCU breached its own contracted by charging multiple NSF Fees on the same item;

E.      Whether CEFCU breached the covenant of good faith and fair dealing by charging Overdraft Fees on transactions that did not overdraw an account;

F.      Whether CEFCU breached the covenant of good faith and fair dealing by charging multiple NSF Fees on the same item;

G.      Whether CEFCU was unjustly enriched by charging Overdraft Fees on transactions that did not overdraw an account;

H.      Whether CEFCU was unjustly enriched by charging multiple NSF Fees on the same item;

I.      Whether CEFCU developed and engaged in unlawful practices that mischaracterized or concealed its true Overdraft Fee and multiple NSF Fee practices;

J.      The proper method or methods by which to measure damages; and

K.      The declaratory and injunctive relief to which the Classes are entitled.

100.    Typicality:  Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and all members of the Classes have been similarly affected by the actions of Defendant.

101.    Adequacy of Representation:  Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs have retained counsel with substantial experience in prosecuting complex and consumer class action litigation.  Plaintiffs and their counsel are

committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so.

102.    <u>Superiority of Class Action</u>:  Plaintiffs and the members of the Classes suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Classes is impractical.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the Class members.

103.    <u>Risk of Inconsistent or Varying Adjudication</u>:  Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Classes would create a risk of:  (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for CEFCU as the party opposing the Classes; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

104.    <u>Action Generally Applicable to Class as a Whole</u>:  CEFCU, as the party opposing the Classes, has acted or refused to act on grounds generally applicable to the Classes, thereby

making appropriate final injunctive relief or corresponding declaratory relief with respect to the

Classes as a whole.

## FIRST CLAIM FOR RELIEF
## Breach of Contract, Including the Covenant of Good Faith and Fair Dealing
## (On behalf of all Classes)

105.    Plaintiffs incorporate by reference the preceding paragraphs.

106.    Plaintiffs and CEFCU have contracted for banking services, as embodied in

CEFCU's account documents and related documentation.

107.    All contracts entered by Plaintiffs and the Classes are identical or substantively

identical because CEFCU's form contracts were used uniformly.

108.    CEFCU has breached the express terms of its own agreements as described herein

when it charged Overdraft Fees on transactions that did not overdraw an account and when it

assessed multiple NSF Fees on the same item.

109.    Under the law of Illinois, good faith is an element of every contract.  All contracts

impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in

connection with executing contracts and discharging performance and other duties according to

their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently,

the parties to a contract are mutually obligated to comply with the substance of their contract in

addition to its form. Evading the spirit of the bargain and abusing the power to specify terms

constitute examples of bad faith in the performance of contracts.

110.    Subterfuge and evasion violate the obligation of good faith in performance even

when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of

inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of

the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

111.    CEFCU abused the discretion it granted to itself when it charged Overdraft Fees on transactions that did not overdraw an account and when it assessed multiple NSF Fees on the same item.

112.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

113.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing revenue from Plaintiffs and other members of the Classes.

114.    Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contracts.

115.    Plaintiffs and members of the Classes have sustained damages as a result of Defendant's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

116.    Plaintiffs and members of the Classes have no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On behalf of all Classes)**

117.    Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.  Plaintiffs will not pursue unjust enrichment if their breach of contract claim survives at the time of trial.

118.    Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for unjust enrichment.

119.     By means of Defendant's wrongful conduct alleged herein, Defendant knowingly assessed improper bank fees on Plaintiffs without the consent of Plaintiffs, and by the use of misrepresentations and omissions.

120.     CEFCU knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes. In so doing, Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

121.     As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

122.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

123.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification.  Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

124.     The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Classes. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds it received. A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiffs and the members of the Classes.

125.     Plaintiffs and members of the Classes have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
### Illinois Consumer Fraud and Deceptive Business Practices Act
### (On behalf of the Illinois Subclasses)

126.     Plaintiffs incorporate by reference the preceding paragraphs as if fully

incorporated herein.

127.     CEFCU has violated the Illinois Consumer Fraud and Deceptive Business

Practices Act ("ICFA"), 815 Ill. Comp. Stat. Ann.  505/1, *et seq*.

128.     Section 2 of the ICFA, 815 Ill. Comp. Stat. Ann. 505/2, provides:

Unfair methods of competition and unfair or deceptive acts or practices, including
but not limited to the use or employment of any deception, fraud, false pretense,
false promise, misrepresentation or the concealment, suppression or omission of
any material fact, with intent that others rely upon the concealment, suppression
or omission of such material fact, or the use or employment of any practices
described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved
August 5, 1965, in the conduct of any trade or commerce are hereby declared
unlawful whether any person has in fact been misled, deceived or damaged
thereby. In construing this section consideration shall be given to the
interpretations of the Federal Trade Commission and the federal courts relating to
Section 5(a) of the Federal Trade Commission Act.

129.     Section 10a of the ICFA, 815 Ill. Comp. Stat. Ann. 505/10A, provides in relevant

part:

Any person who suffers actual damage as a result of a violation of this Act
committed by any other person may bring an action against such person. The
court, in its discretion may award actual economic damages or any other relief
which the court deems proper . . .

* * *

(c)     Except as provided in subsections (f), (g), and (h) of this Section, in any
action brought by a person under this Section, the Court may grant injunctive
relief where appropriate and may award, in addition to the relief provided in this
Section, reasonable attorney's fees and costs to the prevailing party.

130.     Plaintiffs and other Class members are "consumers" or "persons," as defined

under the ICFA, 815 Ill. Comp. Stat. Ann. 505/1, *et seq*.

131.    CEFCU's conduct, as alleged in this complaint, occurred in the course of trade and commerce.

132.    CEFCU knowingly and intentionally employed an unfair and deceptive policy and practice of charging Overdraft Fees on transactions that were approved and authorized into a sufficient available balance, and misrepresenting and failing to disclose its policy and practice of charging Overdraft Fees on transactions that were approved and authorized into a sufficient available balance.

133.    CEFCU also knowingly and intentionally employed an unfair and deceptive policy and practice of charging multiple NSF Fees on the same items, and misrepresenting and failing to disclose its policy and practice of doing so.

134.    CEFCU also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated ICFA by, *inter alia*, abusing its discretion to interpret undefined terms in a manner harmful to consumers and beneficial to CEFCU.

135.    CEFCU's statements and omissions were material and were likely to mislead Class members and, in fact, did mislead Class members.

136.    CEFCU made these statements and omissions with the intent that Class members would rely on them.

137.    As a direct and proximate result of CEFCU's conduct, Class members have suffered actual damages.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE IUDTPA, 815 Ill. Comp. Stat. Ann.  510, *et seq.*
### (On Behalf of Plaintiffs and the Classes)

138.    Plaintiffs re-allege and reincorporate by reference the preceding paragraphs as if fully set forth herein.

139. Defendant is a "person" within the meaning of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510, *et seq*. (the "Act".)

140. Plaintiffs and members of the proposed Classes are "persons" within the meaning of the Act.

141. Defendant's checking accounts and banking services are "goods" or "services" within the meaning of the Act.

142. As described above, Defendant engaged in deceptive trade practice when, in the course of Defendant's business, Defendant: (a) represented and continues to represent that goods or services have approval, characteristics, uses, benefits, or quantities that they do not have; 815 Ill. Comp. Stat. Ann. 510/2 (a)(5); (b) represented and continues to represent that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; 815 Ill. Comp. Stat. Ann. 510/2 (a)(6); (c) advertised and continues to advertise goods or services with intent not to sell them as advertised; 815 Ill. Comp. Stat. Ann. 510/2 (a)(9); (d) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding; 815 Ill. Comp. Stat. Ann. 510/2 (a)(12); (e) for other such violations of the Act that discovery will uncover.

143. In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

144. Defendant's deceptive practices deceived Plaintiffs and Class members and deceived a substantial segment of the Illinois public.

145. Defendant's deception is material as it influenced purchasing decisions.

146. Defendant continues to engage in these deceptive and misleading acts and practices, and Plaintiffs and Class members continue to be damaged by Defendant's conduct.

147. Defendant's actions as described herein were done with conscious disregard of Plaintiffs' rights and Defendant was wanton and malicious in Defendant's concealment of the same.

148. As a direct and proximate result of Defendant's violations of law, Plaintiffs and Class members have been injured.

149. Defendant's practices, acts and courses of conduct in connection its fee practices, as described above, are likely to mislead a reasonable consumer acting reasonably under the circumstances. Plaintiffs and Class members are entitled to injunctive relief prohibiting Defendant from continuing in the future the unlawful, unfair, or fraudulent practice as described herein.

150. Plaintiffs, individually and as members of the Classes, have no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above.

151. Accordingly, Plaintiffs and Class members are entitled to injunctive relief to prohibit Defendant from continuing to perpetrate its deceptive scheme as described herein.

152. In bringing this action, Plaintiffs have engaged the services of attorneys and have incurred reasonable legal expenses in an amount to be proved at trial.

153. Plaintiffs are also entitled to recover their attorneys' fees, costs, and expenses.

**FIFTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Classes)**

154. Plaintiffs re-allege and reincorporate the allegations contained within each of the foregoing allegations as if fully rewritten.

155. An actual case and controversy has arisen and now exists between the parties in that Plaintiffs contend, and are informed and believe that Defendant denies, that Defendant is not

allowed to (a) charge Overdraft Fees on transactions that did not overdraw an account and (b) is not allowed to charge more than one NSF fee on the same item under Illinois law or under the terms of the Deposit Agreement.

156.    Plaintiffs and Class Members seek a declaration that Defendant's acts and practices are unlawful as described herein and request this Court issue permanent injunctive relief to enjoin Defendant from continuing to engage in these deceptive, false and misleading acts and practices.

157.    Plaintiffs and Class members have no adequate remedy at law to deter the continuing activity on the part of Defendant.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs on their own behalf and on behalf of the Classes respectfully request that the Court:

(a)    Certify this case as a class action pursuant to Rule 23, appointing Plaintiffs as class representatives and appointing counsel for Plaintiffs as lead counsel for the Classes;

(b)    Award Plaintiffs and the Classes actual, incidental, and consequential damages in an amount to be proven at trial, including any and all compensatory damages, punitive damages, restitution, any applicable penalties and interest, authorized attorneys' fees, interest, and costs, and any further relief as the Court deems just, equitable, and proper;

(c)    Declare CEFCU's practices outlined herein to be unlawful;

(d)    Enjoin CEFCU from engaging in the practices outlined herein; and

(e)    Grant Plaintiffs and the Classes a trial by jury.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

BY:     s/ Lynn A. Toops
        Irwin B. Levin
        Richard E. Shevitz
        Vess A. Miller
        Lynn A. Toops
        COHEN & MALAD, LLP
        One Indiana Square, Suite 1400
        Indianapolis, IN 46204
        Telephone: (317) 636-6481
        ilevin@cohenandmalad.com
        rshevitz@cohenandmalad.com
        vmiller@cohenandmalad.com
        ltoops@cohenandmalad.com


        Jeffrey Kaliel (to seek admission Pro Hac
        Vice)
        Sophia Gold (to seek admission Pro Hac
        Vice)
        KALIEL PLLC
        1875 Connecticut Avenue NW
        10th Floor
        Washington, DC 20009
        Telephone: (202) 300-4783
        jkaliel@kalielpllc.com
        sgold@kalielpllc.com


        *Counsel for Plaintiffs and the Proposed
        Plaintiff Classes*